Filed 4/1/16  P. v. Mariscal CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B262278 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA078033) |
| v. | |
| MICHAEL MARISCAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Antonio Barreto, Judge.  Affirmed in part, reversed in part, and remanded.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie A. Miyoshi and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Michael Mariscal was convicted of two counts of murder (Pen. Code, § 187, subd. (a)[1]), three counts of attempted murder (§§ 664 and 187, subd. (a)), street terrorism (§ 186.22, subd. (a)), and possession of a firearm by a felon (§12021, subd. (a)(1)). He contends there was insufficient evidence to support a finding the driver of the vehicle in which defendant was a passenger was a member of defendant's gang. Defendant also contends the trial court erred by instructing the jury that the element of a specific intent to kill required for an attempted murder conviction could be found based on a "kill zone," and by admitting evidence of the psychological impact of the attempted murder on one of the victims. Defendant further contends the trial court erred by imposing a parole revocation fine, and failing to credit defendant for the actual days he served prior to sentencing.

The Attorney General argues the indeterminate abstract of judgment[2] should be corrected to reflect the trial court's oral pronouncements that defendant was sentenced to serve his terms on counts 1-5 consecutively, and was to serve the term of life with a possibility of parole on counts 3-5.

We reverse the trial court's imposition of a $200 parole revocation fine, and its order denying defendant custody credit. We remand the matter for the trial court to amend the abstracts of judgment consistent with this opinion. We otherwise affirm the judgment.

---

[1] All statutory citations are to the Penal Code unless otherwise noted.

[2] The record contains an indeterminate abstract of judgment and a determinate abstract of judgment.

2

# BACKGROUND

## A. Factual Background

### 1. *Prosecution Evidence*

At about 3:00 p.m. on June 22, 2011, an employee of a property management firm located on Centinela Street, about 1.7 miles from Penmar Park in Venice, saw a Hispanic man with a slight build park a light or silver colored Volvo station wagon in the parking space near where she worked. About one hour later, Allan Mateo, Salvador Diaz, Andy Santiago, Emmanuel Vasquez, and Christian Hernandez, were sitting together on bleachers at Penmar Park in Venice. None of the young men were gang members at that time but they knew gang members.

The Volvo station wagon pulled up near the park. Defendant exited the Volvo and approached the group holding his hands behind his back. Defendant asked the young men where they were "from," effectively asking them the name of their gang. Mateo replied they were not gang members. Defendant pulled out a gun, said "Culver City," and shot Mateo. Defendant then pointed the gun toward Diaz, Hernandez, Santiago, and Vasquez.

Defendant shot: Mateo four times, two of which were fatal; Diaz twice in the chest, one of which was fatal; and Hernandez twice in his legs. Santiago fell through the bleachers onto the ground, and then ran and hid behind some parked cars. Neither Santiago nor Vasquez were shot.

Nine .9-millimeter shell casings were found near the bleachers at the park. All of the casings were fired from the same gun.

Maritza Perez, a softball coach, heard the gunshots. Defendant lowered the gun and ran, crossing a street in front of Perez. The headlights of the Volvo turned on.[3] The driver of the car looked over his left shoulder in defendant's direction. Perez saw the

---

[3] Between about 4:00 p.m. and 4:15 p.m., a construction company employee observed a gray Volvo parked at the Centinela Street location.

driver was a thin Hispanic man with short hair. Defendant ran to the car, looked around, and entered the car through the passenger door. The car drove away, but Perez was able to write down a portion of the car's license plate number—"W229." Perez called 911.

Citing People's Exhibit 7, defendant acknowledges the license plate of the car defendant entered was LTWY229. The car had been stolen between June 18 and 19, 2011, and defendant's fingerprints were found on its passenger door. Between approximately 4:00 p.m. and 4:15 p.m., telephone calls were made on defendant's cell phone using cellular towers near where the Volvo was found and near the shooting scene.

At 4:26 p.m., on June 22, 2011, the day of the shooting, defendant texted a female friend, "I love you, babe. If I don't reply, I am busted." At 4:30 p.m., a local news website, yovenice.com, posted a story about the shooting, stating three people had been shot. Defendant texted someone, "Two men shot. One in the leg. Fox11la.com. Also on yo venice." He also texted this person, "Watch the news, bro."

At 4:53 p.m., a local television affiliate of the Fox News Network, posted a story about the shooting on its website. Later that day, defendant texted the female friend as follows: "News. Two men shot, One in leg. Fox 11 L.A. His friend texted back: "Did you shoot someone?" Defendant answered: "Don't text like that, babe. Come on now. Just letting you know what is on and what happened."

The following morning, the Volvo remained parked at the parking space for the vacant apartment complex. The driver's door of the car was half closed and keys were in the ignition. Perez identified photographs of the Volvo as the same car defendant entered after he shot the victims.

The police arrested defendant. After defendant arrived at the police station, he was allowed to use his cell phone. Defendant sent someone a text message, summarized by Los Angeles Police Department Detective Terrance Keyzer as follows: "[Defendant] is saying that he is going to act innocent and ask the person he is talking to, to play along because he is scared. Then [defendant] tells [the person] to erase all messages."

4

Later at the station, defendant told his mother the police would "never find the gun," it was "impossible" for them to find it, and it was "gone."[4] Defendant's mother told defendant the police had taken his cousin's cell phone. In response, defendant asked his mother if his cousin had deleted "the messages," and she responded, "Yeah."

Los Angeles City Police Officer Nicholas Coronado, the prosecutor's gang expert, testified a gang member earns "respect" by "putting in work," i.e., committing crimes. A "roll call" is a list of gang members, usually using their gang monikers/nicknames. The question "Where are you from?" is a threat or a challenge to rival gang members or the public at large that often precedes a confrontation.

Officer Coronado was assigned to the Pacific Police Station's gang enforcement detail and specifically assigned to monitor the Culver City Boys gang. The Culver City Boys gang membership was primarily Hispanic. The gang claimed portions of Culver City and nearby areas of Los Angeles. Venice 13 or "V13" claimed adjacent areas, including Penmar Park. The Culver City Boys had a rivalry with V13, among other local gangs.

The Culver City Boys primary activities included robberies, burglaries, assaults with deadly weapons, vandalisms, narcotics sales, and auto thefts. The gang members used signs including the letters "CXC" and "CC" to identify itself and communicate status in the gang. In 2009, two Culver City Boys gang members were convicted of separate robberies.

Defendant was an admitted Culver City Boys gang members. He had a tattoo of "CC" on his hand and a moniker of "Little Poste." A Culver City Boys roll call with the name "Little Poste" included on it was found in defendant's apartment.

Officer Coronado opined defendant was a Culver City Boys gang member and, based on a set of hypothetical facts matching the facts in this case, the murders and attempted murders were performed for the benefit of, at the direction of, or in association with the Culver City Boys gang. The expert also opined, because the driver of the Volvo

---

**4** The gun used in the shooting was never found.

was willing to help defendant conduct the shootings, the driver "[was] either a fellow gang member or [was] at the time an associate putting in work [to] show that he was "represent[ing the] hood [] too."

## 2. *Defendant's Evidence*

Dr. Mitchell Eisen, defendant's identification expert, testified several variables could affect the accuracy of an eyewitness's identification, including capacity limits on attention; stress and trauma; exposure duration and time passage. According to Dr. Eisen, the manner in which eyewitness evidence is collected may also affect an identification, including how the identification procedure is set-up and admonitions given to the witness. He opined a "double-blind" line-up (such that neither the eyewitness nor the officer conducting the line-up knows whether a suspect is included) is the most accurate manner in which to collect eyewitness evidence.

## B. Procedural Background

The Los Angeles County District Attorney filed an amended information charging defendant with the murders of Mateo and Diaz in violation of section § 187, subdivision (a) (counts 1 and 2), the willful, deliberate, and premeditated attempted murders of Hernandez, Santiago, and Vasquez in violation of sections 664 and 187, subdivision (a) (counts 3-5); street terrorism in violation of section 186.22, subdivision (a) (count 6); and possession of a firearm by a felon in violation of section 12021, subdivision (a)(1) (count 7).

The District Attorney alleged as to counts 1 and 2: defendant committed multiple murders, a special circumstance pursuant to section 190.2, subdivision (a)(3); and defendant committed the murders while he was an active participant in a criminal street gang and did so to further that gang's activities, a special circumstance pursuant to section 190.2, subdivision (a)(22). As to counts 1-3, it was alleged during the commission of the two murders (counts 1 and 2) and the attempted murder of Hernandez (count 3), defendant personally and intentionally discharged a firearm, which caused

6

great bodily injury and death (§ 12022.53, subd. (d)).[5] As to counts 1-5, it was alleged: during the commission of the offenses, defendant personally and intentionally discharged a firearm (§ 12022.53, subds. (b) & (c)); and the offenses were committed by defendant for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(4).[6] As to count 7, it was alleged defendant committed the offense within the meaning of section 186.22, subdivision (b)(1)(A). Following a trial, the jury found defendant guilty on all counts, determined the murders were in the first degree, and found the alleged special circumstances and enhancements to be true.

The trial court sentenced defendant to state prison for the following indeterminate terms, each to run consecutively to each other: on count 1, life without the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count 2, life without the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count 3, life with the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count 4, life with the possibility of parole; and on count 5, life with the possibility of parole. Under section 654, the trial court imposed but stayed sentences on counts 6 and 7, enhancements pursuant to section 12022.53, subdivisions (b) and (c) for counts 1-5, and enhancements pursuant to section 186.22 on counts 1-5, and 7.

The trial court ordered defendant to pay a $200 restitution fine under section 1202.4, subdivision (b), and a $200 parole revocation fine under section 1202.45, to be stayed pending successful completion of parole. The trial court declined to credit defendant for actual time served as of date of sentencing. Defendant filed a timely notice of appeal.

---

[5] Because the crime in this case took place in June 2011, all references to section 12022.53 are to the version of that section in effect at that time. (Stats. 2006, ch. 901, § 11.1.)

[6] All references to section 186.22 are to the version of that section in effect in June 2011. (Stats. 2010, ch. 256, § 1.)

## DISCUSSION

### A.      Substantial Evidence

Defendant contends the judgment of conviction on count 6 must be reversed because there was insufficient evidence the driver of the Volvo was a member of defendant's gang.  We disagree.

#### 1.      *Standard of Review*

"'"[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]'" (*People v. Williams* (2015) 61 Cal.4th 1244, 1281; *People v. Combs* (2004) 34 Cal.4th 821, 849 ["An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise"].)  The same standard of review applies where the prosecution relies on circumstantial evidence.  (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

#### 2.      *Applicable Law*

Section 186.22, subdivision (a), defines the crime of street terrorism and provides in relevant part:  "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . ."  "The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member.  [Citation.]"

8

(*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132, 1140 (*Rodriguez*); *People v. Vega* (2015) 236 Cal.App.4th 484, 503.)  The court in *Rodriquez*, in responding to a hypothetical in which an active participant provides a gang member (a gang leader) with a gun to use in shooting rival gang members, said:  "If the active participant is *not* a gang member, he would be no more guilty of violating section 186.22(a) than the gang leader because only one member of the gang—the gang leader—committed the shootings." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1138.)

### 3. Analysis

The jury was instructed with a CALCRIM No. 1400, which provides:  "At least two gang members of that same gang must have participated in committing the felony offense," and "[t]he defendant may count as one of those members if you find that the defendant was a member of the gang."  "[T]he jury is presumed to follow the trial court's instructions."  (*People v. Fuiava* (2012) 53 Cal.4th 622, 669.)

Substantial evidence permitted the jury to conclude the driver of the Volvo was a member of defendant's gang.  Officer Coronado, the prosecutor's gang expert, opined defendant was a member of the Culver City Boys gang, and testified the Culver City Boys members were primarily Hispanic and the gang's primary activities included assaults with deadly weapons and auto theft.  There was evidence the Volvo had been stolen, and the driver of that stolen car was a Hispanic male.  There was also evidence the driver worked closely with defendant, a comrade who was a Culver City Boys gang member, to carry out the shootings.  He drove defendant to the location of the crimes; waited for defendant to return to the car; started the car and turned on the headlights after seeing defendant running to the car from the scene of the shootings; and facilitated defendant's escape by fleeing the scene after defendant entered the car.  Officer Coronado opined the driver, by helping the shooter, showed he not only knew the shooter and was "associating" with him, but the fact that the car was stolen additionally meant the driver was either a fellow gang member or an associate putting in work with the shooter and representing the gang.

9

Although the evidence could have been reconciled with a finding that the driver of the Volvo was not a Culver City Boys gang member, a rational trier of fact could have also determined the evidence was sufficient to find the driver as a gang member. Nothing more is required to affirm the judgment on count 6. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215; *City of Glendale v. Marcus Cable Associates, LLC* (2014) 231 Cal.App.4th 1359, 1385.)

## B. Jury Instruction

Defendant contends the trial court erred by instructing the jury on the "kill zone" theory (CALCRIM No. 600) for counts 4 and 5 (the attempted murders of Santiago and Vasquez) because it was not supported by substantial evidence. The trial court did not err.

### 1. Standard of Review

"'The trial court has the duty to instruct on general principles of law relevant to the issues raised by the evidence [citations] and has the correlative duty "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." [Citation.]'" (*People v. Alexander* (2010) 49 Cal.4th 846, 920, citing *People v. Saddler* (1979) 24 Cal.3d 671, 681.) A trial court errs when it gives an instruction "which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

### 2. Applicable Law

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Stone* (2009) 46 Cal.4th 131, 136 (*Stone*).) "'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.]'" (*People v. Smith* (2005) 37 Cal.4th 733,

10

741.) The "very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill." (*Id.* at p. 742.)

"[A] primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6 (*Bland*).) "'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' [Citation.]" (*Id.* at pp. 329-330; *People v. Perez* (2010) 50 Cal.4th 222, 232.)

"[T]he 'kill zone' [is not] the only way to establish concurrent intent to kill more than one person in a fired-upon group." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1242.) Instead, the kill zone theory "'is simply a reasonable inference the jury may draw in a given case . . . .'" (*Stone*, *supra*, 46 Cal.4th at p. 137; *Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6).) The language in CALCRIM No. 600 concerning the kill zone theory is not required. (*Bland*, *supra*, 28 Cal.4th at p. 331, fn. 6.) That portion of the instruction is contained in brackets; it is provided for the trial court to use in its discretion. (Bench Notes to CALCRIM No. 600.)

### 3. *Relevant Proceedings*

#### a) The Jury Instructions

Without objection,[7] the trial court instructed the jury on attempted murder with a modified version of CALCRIM No. 600. The jury was instructed, in part, as follows:

---

[7] Defendant contends, and the Attorney General does not dispute, despite the lack of an objection to the instruction on the kill-zone theory of attempted murder liability, the

"Defendant is charged in Counts 3,[8] 4, and 5 with attempted murder. To prove the defendant guilty of attempted murder the People must prove that the defendant took one direct but ineffective step towards killing another person; [¶] and, two, that the defendant intended to kill that person. [¶] . . . [¶] A person may intend to kill a specific victim or victims, and at the same time intend to kill everyone in a particular zone of harm or . . . kill zone. [¶] In order to convict the defendant of the attempted murder in counts 3, 4, and/or 5 the People must prove that the defendant not only intended to kill . . . [Allan] Mateo and/or Salvador Diaz, but also either intended to kill the victim in counts 3, 4 or 5 or intended to kill everyone within the kill zone. [¶] If you have a reasonable doubt whether the defendant intended to kill the victim in counts 3, 4, and /or 5, or intended to kill [Allan] Mateo and/or Salvador Diaz by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of the victim in counts 3, 4, and/or 5."

b)      The Prosecutor's Argument

The prosecutor argued in closing to the jury: "Attempted murder. Again, when you shoot into a crowd of people, you are trying to kill those people. He shot at least nine times. They were direct, but ineffectual steps. The mental state or to elevate it first degree is the same to make it first degree murder. Did he reflect, how much did he reflect and premediate? And the answer is he premediated just as much for the attempted murders as he did for the actual murders. [¶] Another way of looking at the kill zone, I mean, you can conclude that he also attempted to kill Andy Santiago and Manual Vasquez, even though he didn't hit them, because he was trying to kill everyone in that area. He had two [*sic*] obvious intended targets of Salvador Diaz and [Allan] Mateo and Christian Hernandez, but you can conclude that the other two young men were also

issue can be raised on appeal because the instruction affected defendant's substantial rights. (See § 1259; *People v. Flood* (1998) 18 Cal.4th 470, 482, fn. 7.)

[8]      Defendant does not contend the trial court erred by instructing the jury on the "kill zone" theory for count 3 (the attempted murder of Hernandez).

12

intended victims because the intent to kill the people who got shot can be transferred to the people who didn't get hit, that all of them are in this little target area of kill zone where the defendant was just spraying bullets, boom, boom, boom, boom, boom, and all of those people are victims of his attempted murder, whether they got hit or not. [¶] . . . [¶] [T]he defendant approached Salvador Diaz, Allan Mateo, Christian Hernandez, [Emmanuel] Vasquez, and Andy Santiago with his loaded .9-millemeter semiautomatic pistol, and he walked up to the bleachers and he pointed at them and claimed his gang, Culver City, and . . . he fired at least nine shots into that crowd . . . ."

### 4. Analysis

Defendant relies on *People v. McCloud* (2012) 211 Cal.App.4th 788 (*McCloud*) to criticize the kill zone instruction given in this case. *McCloud* stated, without authority, "The kill zone theory thus does *not* apply if the evidence shows only that the defendant intended to kill a particular targeted individual but attacked that individual in a manner that subjected other nearby individuals to a risk of fatal injury. Nor does the kill zone theory apply if the evidence merely shows, in addition, that the defendant was aware of the lethal risk to the nontargeted individuals and did not care whether they were killed in the course of the attack on the targeted individual. Rather, the kill zone theory applies only if the evidence shows that the defendant tried to kill the targeted individual *by killing everyone in the area in which the targeted individual was located.* The defendant in a kill zone case chooses to kill everyone in a particular area as a means of killing a targeted individual within that area. In effect, the defendant reasons that he cannot miss his intended target if he kills *everyone* in the area in which the target is located. [¶] . . . [T]he defendant *specifically intends* that *everyone* in the kill zone die. If some of those individuals manage to survive the attack, then the defendant—having specifically intended to kill every single one of them and having committed a direct but ineffectual act toward accomplishing that result—can be convicted of their attempted murder." (*McCloud*, *supra*, 211 Cal.App.4th at p. 798, some italics added.)

13

*McCloud*, *supra*, 211 Cal.App.4th 788 overstates the kill zone jury instruction. The Supreme Court in *Bland*, *supra*, 28 Cal.4th 313 stated that the intent to kill a person can be inferred from the nature and scope of the attack or from the method employed. (*Id.* at pp. 330, 331, fn. 6.) If, as described by *McCloud*, the defendant must in fact intend to kill each attempted murder victim for the kill zone theory to be applicable, there would be no reason to employ that theory, i.e., the intent to kill would be established without resort to the kill zone theory.

There is substantial evidence to support the jury instruction that the specific intent to kill required for an attempted murder conviction could be found based on a "kill zone." The jury found defendant intended to kill Mateo and Diaz. There is evidence they, along with Santiago, Vasquez, and Hernandez, were sitting as a group on bleachers, and the nature and scope of defendant's attack is that he shot nine bullets at the group. The jury could have reasonably inferred defendant either intended to kill Santiago and Vasquez, or intended to kill everyone within that kill zone.

### C.  Admission of Psychological Impact Evidence

Defendant contends the trial court violated his federal rights of due process and fair trial by erroneously admitting irrelevant evidence concerning the psychological impact of the attempted murder on Santiago. We disagree.

#### 1.  Standard of Review

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason."' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714.) If the erroneous admission "implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225, fn. 7.)

14

## 2. Applicable Law

The admission of evidence regarding the psychological impact of a gunshot victim is irrelevant at trial in a non-capital case. (*People v. Redd* (2010) 48 Cal.4th 691, 731-732.) The admission of evidence violates a defendant's federal due process rights if it makes the trial fundamentally unfair. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

## 3. Relevant Proceedings

During Santiago's testimony, the following exchange occurred: [The Prosecutor]: Now, Mr. Santiago, after this shooting happened in 2011, what trajectory did your life take? [¶] [Defense Counsel]: Objection. Relevance. [¶] The Court: Overruled. Do you understand the question? [¶] [Santiago]: Yeah. [¶] The Court: Did this shooting in any way change the way you were living. [¶] [Santiago]: Yeah. It did. [¶] [The Prosecutor]: How was that? [¶] [Santiago]: I was trying to forget. I started using drugs trying to forget. Everything that happened."

## 4. Analysis

Defendant contends the admission of the challenged evidence, inter alia, violated his federal rights to due process and a fair trial. Defendant forfeited the federal portion of his claim of error by failing to object at trial on any ground other than relevance. (*People v. Martinez* (2010) 47 Cal.4th 911, 961 [defendant forfeited his federal claims, including his claims for violation of his due process and fair trial rights, "because defense counsel objected to [the] evidence only on Evidence Code section 352 grounds"].).

Even if the trial court erred in admitting evidence of the psychological impact of the shooting on Santiago, any error was harmless under the standard of either *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [more favorable outcome for defendant reasonably probable absent error], or *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]. As discussed above, the evidence of defendant's attempted murder of Santiago was overwhelming.

### D.   Cumulative Impact

Defendant contends even if the trial court errors in instructing the jury on the "kill zone" theory for counts 4 and 5, and in admitting evidence of the psychological impact on Santiago, did not warrant reversal of the convictions on counts 4 and 5, the cumulative impact of those errors does.  However, having determined there is no merit to defendant's contention the trial court erred in instructing the jury on the "kill zone" theory for counts 4 and 5, and it was harmless error for the trial court to admit evidence of the psychological impact on Santiago, there is no cumulative error justifying relief.

### E.   Restitution Parole Revocation Fine

Defendant contends, and the Attorney General agrees, the trial court erred in imposing a parole revocation fine.  We accept the Attorney General's concession.

The trial court imposed but stayed all of the determinate sentences (counts 6 and 7), and imposed a $200 parole revocation restitution fine pursuant to section 1202.45.[9]  A parole revocation restitution fine may not be imposed when all determinate sentences have been stayed under section 654.  (*People v. Pearson* (1986) 42 Cal.3d 351, 361; *People v. Cruz* (2012) 207 Cal.App.4th 664, 672-673, fn. 8.)

We reverse the trial court's imposition of the $200 parole revocation restitution fine.  The indeterminate abstract of judgment should be amended to delete any reference to a $200 parole revocation fine.

### F.   Custody Credit

Defendant contends, and the Attorney General concedes, the trial court erred in failing to credit defendant for the actual days he served prior to sentencing.  We agree.

A person convicted of murder is entitled to credit for actual time spent in custody prior to sentencing.  (§ 2900.5, subd. (a); *People v. Herrera* (2001) 88 Cal.App.4th 1353, 1366.)  Defendant was arrested on June 28, 2011, and sentenced on February 11, 2015; a

---

[9]   Although the trial court stayed all of the determinate sentences, the parole revocation fine is reflected on the indeterminate abstract of judgment.

total of 1,325 days.  The trial court declined to credit defendant for the actual days he served prior to sentencing.  As noted, however, defendant was entitled to actual presentence custody credits.

We reverse the trial court's refusal to award defendant custody credit.  Both the indeterminate abstract of judgment and the determinate abstract of judgment should be amended to reflect defendant is entitled to 1,325 actual days of credit.

### G.  Correction of the Indeterminate Abstract of Judgment to Reflect Oral Pronouncements

The Attorney General argues, and defendant agrees, the indeterminate abstract of judgment should be corrected to reflect the trial court's oral pronouncements that defendant was sentenced to serve his terms on counts 1-5 consecutively, and was to serve the term of life with a possibility of parole on counts 3-5.  The abstract of judgment must be so amended.

The indeterminate abstract of judgment of fails to reflect the trial court sentenced defendant to serve his indeterminate terms for counts 1-5 consecutively.  It also reflects the trial court sentenced defendant to three terms of 15 years to life on counts 3-5, but on counts 3-5 the trial court sentenced defendant to terms of life with the possibility of parole.  (§§ 186.22, subd. (b)(5), 664, subd. (a).)

An abstract of judgment must fully and accurately reflect a defendant's sentence.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 (*Mitchell*).)  "[A] trial court's oral sentence governs if it is different from what appears in a minute order or an abstract of judgment [citations] . . . ."  (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1221;

*Mitchell, supra*, 26 Cal.4th at p. 185; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3.)  Accordingly, the indeterminate abstract of judgment should be amended to reflect the trial court sentenced defendant to serve his indeterminate terms on counts 1-5 consecutively, and to serve the term of life with a possibility of parole on counts 3-5.

## DISPOSITION

We reverse the trial court's imposition on defendant of a $200 parole revocation restitution fine, and its refusal to award defendant custody credit.  The matter is remanded for the trial court to amend the indeterminate abstract of judgment to delete any reference to a $200 parole revocation fine; reflect defendant is to serve his indeterminate terms on counts 1-5 consecutively; and to indicate the term on counts 3-5 life with a possibility of parole.   The trial court shall also amend both the indeterminate abstract of judgment and the determinate abstract of judgment to reflect defendant is entitled to 1,325 actual days of custody credit.  The clerk of the superior court is to deliver the amended abstracts of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KUMAR, J.[*]

We concur:



TURNER, P. J.



KRIEGLER, J.

---

[*]    Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18